

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed January 25, 2024

_____
United States Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| DONALD ROY SEILHEIMER, | § | CASE NO. 23-30671-SGJ-13 |
| DEBTOR. | | (Chapter 13) |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT IMPOSING COMPENSATORY SANCTIONS AND OTHER REMEDIES, AS A RESULT OF THE CONTINUING CONTEMPT OF COURT COMMITTED BY RUFUS HAMPTON, JR.

These are the court's Findings of Fact, Conclusions of Law, and Judgment, now being rendered after ***eleven*** hearings (held June 20, 2023; July 17, 2023; August 21, 2023; August 28, 2023; September 13, 2023; September 14, 2023; September 21, 2023; October 19, 2023; October 27, 2023; December 14, 2023; and January 11, 2024; hereinafter, the "Eleven Hearings")[1] involving the troubling interactions between Rufus Hampton, Jr. ("Mr. Hampton") and the above-referenced Chapter 13 Debtor. These troubling interactions evolved into civil contempt of court

_____

[1] There was also another significant hearing, on May 11, 2023, on a motion to vacate dismissal order and reinstate case filed by the Chapter 13 Trustee.  *See* DE ## 2023.

1

(which this court herein addresses) and likely also bankruptcy crimes, perjury, and elder abuse (with regard to which this court will make appropriate referrals). This court takes judicial notice of all evidence and testimony heard at the Eleven Hearings. The pleadings giving rise to these Eleven Hearings, and Orders issued thereafter, may be found at DE ## 24, 38, 50, 74, 79, 95, 96, 100, 102, 109, 119, 131, 134, 141, 158, and 159.

In short, the contemnor Mr. Hampton, who refers to himself as "Pastor Rufus Hampton"—although he (a) has never served at any church or place of worship, (b) has no degree from a seminary or other educational institution, and (c) has no credentials or experience that would otherwise be typical of a pastor—met the Debtor prepetition and purported to provide assistance to the Debtor, ***including legal assistance***. In addition to lacking any religious credentials, Mr. Hampton also has no law degree or license, but has set up multiple nonprofit entities that purport to provide or connect persons to legal services (e.g., N3APJC, Inc., dba N3AP Justice Center; Hillcrest Antioch Ministries; and Kingdom Ministries). At one point, Mr. Hampton testified that:

> I have a right to protect God's sheep under Romans 13, which deals with obeying the law and everything like that. So, as a pastor, if I can't, you know direct people about the law, you know, and the Bible says that they should do it.[2]

Notably, the only two lawyers that ever were associated with Mr. Hampton's non-profit entities quickly distanced themselves from Mr. Hampton after a matter of weeks. One of those lawyers resides in the state of Florida and has apparently, for several years (along with his domestic partner), been under suspicion for the unsolved 2016 murder of a respected Dallas attorney.[3]

---

[2] Transcript, June 20, 2023 Show Cause Hearing 93:13-19.
[3] *Id.* at 22:10-24; Transcript, July 17, 2023 Continued Show Cause Hearing 34:3-36:21 (quite shockingly, Mr. Hampton testified that he had initially reached out to this particular lawyer because he thought he might be able to help this lawyer and his domestic partner in their defense against the murder allegations, saying he knew "Other suspects" . . . "Including me as one of them because I dealt with him" ("him" being the murdered Dallas attorney.).

The Debtor is elderly (late 70's) and has significant health issues. The Debtor is a single man with no children or other family to look after him. A *guardian ad litem* was temporarily appointed for the Debtor by this court, for purposes of this case (pursuant to Bankruptcy Rule 1004.1) and, more recently, one was appointed over the Debtor for broader purposes, by a probate court in Dallas County, Texas. But, prior to all this, Mr. Hampton obtained a power of attorney from the Debtor, at a time when the Debtor's capacity to provide such authority was extremely dubious, and Mr. Hampton subsequently took control of certain financial affairs of the Debtor. During this time frame, a house that the Debtor inherited from his late mother (at 2910 Perryton Drive, Dallas, Texas) was foreclosed upon. There was significant equity in that house. The excess proceeds of the sale of 2910 Perryton Drive, in the amount of $62,421.82, evidenced by a check sent by FedEx to Mr. Hampton by the law firm handling the foreclosure for the mortgage servicer (apparently relying on the power of attorney), were subsequently taken and disbursed by Mr. Hampton **post-petition** in this case (the foreclosure happened **prepetition**, but the proceeds were received by Mr. Hampton on the Debtor's behalf **post-petition**). In other words, Mr. Hampton exercised control over property of the bankruptcy estate, in violation of section 362(a)(3) of the Bankruptcy Code. 11 U.S.C. § 362(a)(3). Evidence at various hearings was unrefuted that while a small amount of those funds may have been paid over to the Debtor or others, Mr. Hampton himself took ***at least* $44,210.91** of these funds—such amount having been directly wired from the Debtor's bank account to Mr. Hampton's own personal Truist bank account (hereinafter, the "Misappropriated House Sale Proceeds")—for Mr. Hampton's own personal use.[4]  ***To be clear, the Misappropriated House Sale Proceeds would have been nonexempt property of the Debtor's bankruptcy estate available to fund a Chapter 13 plan in the Debtor's case***. The Debtor has,

---

[4] *See, e.g.*, Transcript Oct. 27, 2023 Contempt Hearing, 28:9-23.

3

among other debts, a large arrearage on the home in which he resides (which is now at risk of foreclosure) and very large medical debt. The evidence presented to the court also reflected that there was much more equity in the 2910 Perryton Drive property than the $62,421.82 that resulted from the foreclosure sale (which was based on a sale price of $152,500). Specifically, the 2910 Perryton Drive house was resold twice, just a few weeks after the foreclosure sale, and the last sale price was $209,000 (in other words, there appears to have been at least **$56,500** [$209,000 - $152,500] *more* equity in 2910 Perryton Drive (hereinafter, the "Extra Equity") than resulted at the foreclosure sale). If the Debtor had had a licensed and knowledgeable bankruptcy attorney advising him, rather than Mr. Hampton, he might have realized the Extra Equity. But, as it stands now, the Debtor has, at a minimum, been deprived of the Misappropriated House Sale Proceeds, through the actions of Mr. Hampton.

As alluded to, the court has held Eleven Hearings, and herein takes judicial notice of all testimony and evidence presented at those hearings. These hearings have pertained to various Show Cause Orders and Contempt Motions and Orders [*see* DE ## 24, 38, 50, 74, 79, 95, 96, 100, 102, 109, 119, 131, 134, 141, 158, and 159] at which this court has directed Mr. Hampton to turn over what remains of the Misappropriated House Sale Proceeds—or property in which he may have invested the Misappropriated House Sale Proceeds. The court has given Mr. Hampton ample opportunity to purge his contempt. Mr. Hampton has testified many times and has not contested the basic facts. He simply contests the court's jurisdiction or authority regarding the Misappropriated House Sale Proceeds. He cites to the Power of Attorney. He cites to still-pending probate proceedings involving the Debtor's late mother. He blames attorneys, the Chapter 13 Trustee, the mortgage servicer on 2910 Perryton Drive, and this court. The court has found Mr. Hampton to be in contempt of court for a significant period of time for failing to turnover the

4

Misappropriated House Sale Proceeds or records pertaining to same, which the court also required him to turn over (some records were eventually produced). On certain occasions, the court has directed the U.S. Marshals to take Mr. Hampton into custody until he was willing to purge himself of his contempt by turning over the Misappropriated House Sale Proceeds (or property into which the Misappropriated House Sale Proceeds may have been converted—including certain used cars that may have been purchased with part of the Misappropriated House Sale Proceeds). Mr. Hampton was held in custody by the U.S. Marshals at a detention facility, for a few weeks. Mr. Hampton reported in open court that he liked being in jail, he was making money somehow by being there, and he hoped the court would send him back. After a few weeks of jail stays, followed by court hearings where he expressed several times the desire to return to jail, it appeared that keeping Mr. Hampton incarcerated was unlikely to lead to him purging himself of his contempt. Evidence was eventually presented (through bank statements, ultimately) that showed that most of the Misappropriated House Sale Proceeds had been dissipated within days after being wired to Mr. Hampton's personal account, with large amounts also being paid to his wife, Lori Hoehn.[5] The court next accepted proposed repayment terms for Mr. Hampton and his family to repay the Misappropriated House Sale Proceeds[6] (on which repayment terms Mr. Hampton quickly defaulted). The court next accepted an offer by the Debtor's adult son (Rufus James "Patrick" Hampton) to assist in a sale of certain of the used cars that the Debtor had testified he had control over (if not outright title) to repay the Misappropriated House Sale Proceeds. The Chapter 13 Trustee and court were presented with a list of 15 used cars purportedly owned by an entity named

---

[5] While Mr. Hampton referred to Lori Hoehn as his wife, Mr. Hampton's own son testified that he did not really think she was his wife but, rather, just a business partner of some sort. Transcript Dec. 4, 2023 Contempt Hearing, p. 55.
[6] Mr. Hampton and/or his purported wife and/or his son allegedly have rental properties. *See, e.g.*, Transcript Oct. 27, 2023 Contempt Hearing, pp. 61-64; 74-80.

Mario's Auto Mart Dallas, and Mr. Hampton testified that he had control over Mario's Auto Mart Dallas[7] and/or otherwise had authority to arrange for the sale of the cars. The Chapter 13 Trustee was presented with titles to some of these cars—the authenticity of which was not at all certain. The court later heard testimony from Mario Moreno (the "Mario" of "Mario's Auto Mart Dallas") that Mr. Hampton had only performed bookkeeping services and licensure services for Mario's Auto Mart, and that he had no ownership or control over the cars (notwithstanding the fact that many of the cars are parked at a business location leased by Mr. Hampton—allegedly for his non-profit entities N3AP Helpers and N3AP Justice Center—and Mario's Auto Mart has lost or forfeited its dealer license/right to do business). There is allegedly an individual named Henry Zrubeck with liens/encumbrances on the cars that has never testified.

***The court cannot believe one word of testimony at this point from Mr. Hampton, his family, or Mario Moreno***. The car business and the opacity with regard to the ownership of cars[8] (including "open" titles) seems almost as troubling as Mr. Hampton taking the Misappropriated House Sale Proceeds. The court cannot help but wonder, at this point, if the 15 used cars that were being offered, for a while, by Mr. Hampton as a means to purge his contempt, are, in fact, stolen cars—but this is beyond this court's jurisdiction.

The court has exhausted all reasonable possibilities at this point. The goal was, at all times, to obtain a return of the Misappropriated House Sale Proceeds—which would help the Debtor get back on his feet. Mr. Hampton is not in the least bit remorseful for the problems he has caused to an elderly, single man with health problems. Moreover, this court is aware of Mr. Hampton attempting to provide "legal help" to at least one other elderly debtor in this district, *In re Myrtle*

---

[7] *See, e.g.*, Transcript Oct. 27, 2023 Contempt Hearing, pp. 14-15.
[8] *See, e.g.*, Transcript Dec. 4, 2023 Contempt Hearing, pp. 8-25 (discussing whereabouts of car titles and which ones might have "open" titles and which ones might be lost).

*Lucille Dupree* (a woman in her 90's). Mr. Hampton quite clearly and convincingly is in bad faith contempt of this court.

Based on the foregoing,

**IT IS ORDERED** that Rufus Hampton is found to be in continuing civil contempt of this court, based on his continued failure to comply with this court's orders requiring turnover of the Misappropriated House Sale Proceeds or any property into which he may have converted same. Pursuant to sections 362(a)(3), 541, and 542 of the Bankruptcy Code.

**IT IS FURTHER ORDERED** that as compensatory damages, Mr. Rufus Hampton, Jr. shall owe this bankruptcy estate: (a) $44,210.91, representing the amount of the Misappropriated House Sale Proceeds; (b) another $56,500, representing the representing the Excess Equity that Mr. Hampton's actions caused the Debtor and this estate to have been deprived; (c) another $26,400, representing reasonable attorney's fees incurred by the Chapter 3 Trustee (Tom Powers) in attending 11 hearings on this matter (assuming 3 hours per hearing, for a total of 33 hours, at $400 per hours); (d) another $26,400, representing reasonable attorney's fees incurred by the Debtor's attorney (Daniel Sherman) in attending 11 hearings on this matter (assuming 3 hours per hearing, for a total of 33 hours, at $400 per hours); and (e) another $7,200, representing reasonable attorney's fees incurred by the guardian ad litem appointed by this court (Marilyn Garner) in attending six hearings on this matter (assuming 3 hours per hearing, for a total of 18 hours, at $400 per hours).

**IT IS FURTHER ORDERED** that these monetary sanctions, in the total amount of $160,710.91, shall have the full force and effect of a final judgment of this court, which may be enforced by all means available at law.

**IT IS FURTHER ORDERED** that this Judgment shall bear post-judgment interest at the current federal judgment rate of 4.81%, accruing from the date of its entry.

**IT IS FURTHER ORDERED** that neither Rufus Hampton, Jr. nor any of his family members (including but not limited to Lori Hoehn and Patrick Hampton) nor anyone else acting on his behalf shall go within 500 feet of the Chapter 13 Debtor, Donald Seilheimer or his property.

**IT IS FURTHER ORDERED** that neither Rufus Hampton, Jr. nor any of his family members or anyone else acting on his behalf shall communicate in any way, directly or indirectly, with the Chapter 13 Debtor, Donald Seilheimer or his property.

**IT IS FURTHER ORDERED** that Rufus Hampton, Jr. shall not go within 500 feet of the United States Bankruptcy Clerk's Office for the Northern District of Texas, Dallas Division.

As earlier noted, this court will make appropriate referrals concerning Mr. Rufus Hampton Jr.'s activities to the U.S. Attorney, State Bar of Texas, and other law authorities deemed appropriate.

# # #  **END OF FINDINGS OF FACT, CONCLUSIONS OF LAW,**

**AND JUDGMENT  # # #**